IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 8, 2013

**STATE OF TENNESSEE v. XAVION LYNDON UNDERWOOD**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1892     Cheryl A. Blackburn, Judge**

_____

**No. M2012-02065-CCA-R3-CD   Filed October 18, 2013**

_____

Appellant, Xavion Lyndon Underwood, was convicted of aggravated robbery, for which he received a ten-year sentence.  He appeals his conviction and sentence, arguing that the evidence was insufficient to support his conviction and that the trial court erred in sentencing him.  Upon our review, we discern no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Brian T. Boyd, Brentwood, Tennessee, for the appellant, Xavion Lyndon Underwood.

Robert E. Cooper, Attorney General and Reporter; Meredith DeVault, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I.  Facts

This case involves the April 15, 2011 aggravated robbery of Lee's Market in Nashville, Tennessee.

A. Facts from Trial

The State's first witness was Flora Haule. She testified that on April 15, 2011, she worked as a cashier at Lee's Market on 17th Avenue North in Nashville. Her four-month-old son was at work with her. Around 1:30 p.m. that day, the store was robbed. She identified appellant in court as the perpetrator. Ms. Haule explained that the cashier area was located behind the counter and that it was separated from the rest of the store by a large piece of plate glass. She would enter the cashier area through a door that was kept locked. She completed business transactions with customers through a small window opening in the glass.

Ms. Haule testified that she had seen appellant approximately three times before the robbery on April 15, although it had been almost one year since she had seen him. She knew that appellant was a resident of the Oasis Center,[1] and she had seen him in the store talking with other residents. When appellant entered the store, he was dressed in black pants and a black hooded jacket, and he was wearing a red bandanna over the lower half of his face. As he entered, he pointed a gun at other customers, and they fled the building. Appellant then jumped over a counter and kicked in the security door to the cashier's area. He pointed the gun at Ms. Haule and told her to open the cash registers or he would kill her. She described the gun as being small and silver. She stated that she was "scared" during the ordeal. Ms.

---

[1] As further described herein, the Oasis Center in Nashville is an organization that provides a variety of clinical and residential services in the community.

Haule opened the cash register drawer, and appellant removed the money. She estimated that he stole approximately $84-85. Appellant also grabbed three packs of Newport cigarettes.

Ms. Haule testified that after appellant left, she called the police, who responded within ten minutes. She explained to officers that the perpetrator was a client of the Oasis Center, and shortly thereafter, they brought appellant back to the store for Ms. Haule to identify. She positively identified appellant as the person who had robbed her. Officers returned $84 and three packs of Newport cigarettes to her.

On cross-examination, appellant's counsel attempted to impeach Ms. Haule with her testimony from the preliminary hearing. She clarified that she had, indeed, seen appellant in the store more than three times prior to the date of the robbery. Ms. Haule explained that when police officers brought appellant back to the store for her to make an identification, she was seated in the back seat of a patrol car. Appellant was wearing neither the hood nor a bandanna when she identified him. Ms. Haule also corrected her earlier testimony and said that after the robbery, she called 9-1-1, hung up, and then called her husband. The 9-1-1 operator called her back, and she explained what had happened. She confirmed that she recognized appellant both when he first entered the store prior to the robbery and subsequently when the police brought him back to the scene.

The State's next witness was Officer Christopher Peercy with the Metro Nashville Police Department. He testified that he was the first patrol unit dispatched to respond to the call at Lee's Market on April 15, 2011. He stated that in a situation such as this, as many officers as possible would respond to attempt to apprehend the perpetrator before he left the area. After insuring the well-being of Ms. Haule and her baby, Officer Peercy asked for a description of the offender so he could communicate it via radio to other officers in the area. At that point, Ms. Haule told Officer Peercy that she knew the person who robbed the store, that she had seen him several times, and that she believed he resided at the Oasis Center. He was present when appellant was brought back to the store and the stolen items were returned to Ms. Haule.

Officer Arthur Hummell with the Metro Nashville Police Department testified next. On April 15, 2011, he was a crime analyst and patrol officer with the West Precinct of the department. He testified that he participated in the arrest of appellant. He received a description of the offender and identified a suspect matching the description standing in the doorway of a nearby dairy, which was adjacent to a bus stop. The suspect, later identified as appellant, was dressed in black pants and carried over his shoulder a black pullover "hoodie" as described in the radio call. Officer Hummell circled the block and parked in a way that concealed his patrol car. He then proceeded on foot to approach appellant. When he approached appellant, he indicated that he wanted to speak with appellant. Appellant

-4-

attempted to board a bus that was arriving, but Officer Hummell prevented him from doing so. Officer Hummell detained appellant until other officers arrived. He then searched the "hoodie," where he found a small silver gun and a red bandanna. Another officer searched appellant's person and collected cash and three packs of Newport cigarettes.

Through Officer Hummell, the State introduced into evidence the black hoodie appellant was wearing, the red bandanna, a handgun and magazine, and bullets. The cash and cigarettes were not collected as evidence because those items were returned to Ms. Haule.

Detective Kevin Taylor with the Metro Nashville Police Department was the State's next witness. He testified that he was involved with the investigation of the robbery at Lee's Market on April 15, 2011. When he first became involved, he responded to the location where appellant had been apprehended. He saw the items that officers had recovered from appellant, including a small silver handgun, packs of cigarettes, and cash. Detective Taylor was also present when Ms. Haule identified appellant. He testified that the procedure was called a "show-up," which occurs when officers apprehend a suspect within a reasonable amount of time after a crime has occurred and they "show" him to a victim or witness at the scene for identification. In this case, Ms. Haule positively identified appellant as the offender. She was in a patrol car that was parked within ten to twenty feet from appellant,

and she had an unobstructed view of him. Detective Taylor also identified appellant in the courtroom at trial.

The State called Officer Roy Morris, also with the Metro Nashville Police Department, as its next witness. He was assigned to the Tactical Investigations Section of the department as a crime scene investigator. He responded to Lee's Market following the robbery. At the scene, Officer Morris attempted to lift latent prints from the counter top over which appellant leapt. He obtained eight cards of latent prints from the counter. He explained the process utilized in retrieving prints, as well as the inherent difficulties in obtaining prints from a glass surface in a high-traffic area. Officer Morris stated that he also photographed the scene.

On cross-examination, Officer Morris acknowledged that returning stolen property to victims is a procedure that they sometimes utilize when they can document the property through photographs.

Linda Wilson, a civilian employee with the Metro Nashville Police Department, testified that she had been employed there as a latent print examiner for twelve years. She was accepted by the trial court as an expert in latent fingerprint identification without objection. Ms. Wilson indicated that of the eight cards she received from Officer Morris,

only four of the cards contained viable latent prints. She compared them with appellant's known fingerprints and was unable to confirm any matches.

The State's next witness was Cheryl Mendez, an eighteen-year employee of the Oasis Center and the center's senior director for clinical and residential services. She testified that the Oasis Center offered a variety of services, such as counseling, an emergency shelter, transitional living accommodations, a college connection program, summer programs, and youth leadership programs. She confirmed that appellant had received services from the Oasis Center intermittently from February 2009 through February 2011.

On cross-examination, Ms. Mendez further explained that appellant had received services from the transitional living and street outreach programs. She stated that to utilize their "drop-in" service, clients were required to sign in, but there were other areas of the Oasis Center that clients could utilize without first signing in. Following Ms. Mendez's testimony, the State rested its case.

Appellant then called Margaret Petis as a witness. She testified that she was acquainted with appellant because he had resided with her in her apartment for a short time. She stated that on April 15, 2011, she drove appellant to school, which was located across the street from the Oasis Center. He had stayed at her apartment the previous night. While

appellant was there, Ms. Petis did not see him in possession of a gun but noted that he had some money and some Newport cigarettes. She also gave him another pack of Newport cigarettes when she took him to school on April 15.

On cross-examination, Ms. Petis denied that she was involved in a sexual relationship with appellant. They were unrelated to each other but had some friends in common. She did not charge appellant for staying at her apartment. She estimated that appellant stayed with her "seventy-five percent" of the time. Ms. Petis stated that she would let other men with whom she did not have a relationship stay with her, as well. She stated that she did not have employment during that time but performed "odd jobs." To sustain themselves, her son received Social Security benefits, and she received food stamps.

Appellant's next witness was Barnibus Batarseh, a private investigator who worked on appellant's case. As part of his investigation, he photographed the crime scene. Based on information gathered from appellant, Mr. Batarseh placed parked cars at the scene and measured the distance between them, estimating the distance to be "roughly eighty-five feet."

Appellant testified in his defense. He stated that on April 15, 2011, Ms. Petis drove him to school, and he then went to the Oasis Center. He was studying for his GED at school until noon. He testified that each day when he finished school, he went to the Oasis Center,

and although clients were supposed to sign in each time, he did not always do so. Appellant said that on the day in question, he had two packs of cigarettes, some money, and a telephone. He stated that he had more than $80 in his possession because Ms. Petis gave him some money and because he sold "weed" sometimes.

Appellant testified that on the day in question, he was standing at the bus stop waiting to board a bus to Tennessee Village. According to appellant, he happened across a jacket and put it on because it was raining and he did not have a jacket. He reached into the pocket and found some cigarettes, then placed them in his own pocket. He also found a bandanna and a gun. He said that when he found those items, he dropped the jacket and moved away from it. He stood in the doorway of a building next to the bus stop and waited. Appellant testified that the police never approached him and that the bus arrived and after paying his fare, he boarded it. He stated that the police then arrived, stopped the bus, and required that he exit the bus. The bus had traveled a short distance so that when appellant exited the bus, he was standing next to the jacket he had discarded earlier. Officers picked up the jacket and asked if it belonged to him, which he denied. They searched the jacket and located the gun. He stated that they handcuffed him, placed him in a patrol car, talked with him for a time, then removed him from the car and searched him. They seized his money, his cigarettes, and his telephone.

Appellant said that officers drove him to Lee's Market and parked in the alley behind the market. He stated that they parked in such a way that he could not see the other patrol car that was on the scene. He said that he thought someone was in the back seat of the other patrol unit but that he could not see the person's face. Appellant maintained that the police car in which he was transported was hidden from view from the patrol car in which the witness was seated and that he was shown to the witness while wearing handcuffs.

In a jury-out hearing before the State began its cross-examination, it stated its intent to question appellant about his 2009 conviction for attempted criminal simulation, a crime of dishonesty.[2] After ascertaining that the State had given proper notice, the trial court allowed the line of questioning without objection from appellant.

On cross-examination, the State first pointed out the change in appellant's appearance since the offense date, including two facial tattoos and an eyebrow piercing. The State then questioned appellant about his failure to sign in at school and the Oasis Center on April 15, 2011. Appellant testified that Ms. Petis gave him money and cigarettes on that date so that he could use all of the money to "re-up on [his] weed, so [he] could make a bigger profit."

Appellant maintained that Detective Taylor was "very wrong" about the distances on

---

[2] *See* Tenn. R. Evid. 609(a)(2).

the photographs from the crime scene that showed the locations of the patrol cars. He claimed that the vehicles were eighty-five feet apart when Ms. Haule identified him. He admitted that he had been inside of Lee's Market but that he had not been there for a year because he had been incarcerated. He also stated that he had engaged in conversation with Ms. Haule previously and that he had told her he was involved with the Oasis Center.

On redirect examination, appellant explained that he was convicted of attempted criminal simulation after he became involved in the scheme with a female. He stated that he only participated because he "didn't have anything," that he was homeless at the time, and that he only participated to get money for food. Following this testimony, appellant rested his case.

Following deliberations, the jury found appellant guilty of aggravated robbery as charged in the indictment.

### B. Facts from Sentencing

The State introduced the presentence report into evidence at the hearing. Appellant presented Laurette Underwood, his mother, as his only witness. She testified that appellant was "an artist and really a good kid." She believed appellant when he told her he was

innocent.  She said that she loved him and wanted him to get out of jail in time to pursue his dreams.  She also stated that appellant had suffered from bipolar disorder and depression for most of his life and that he did well when he took his medication regularly.

On cross-examination, the State asked Ms. Underwood if she was familiar with an unrelated case wherein appellant was charged with a similar crime.  Ms. Underwood opined that the affidavit was "laughable" but acknowledged that appellant was "familiar with the woman" who was involved in that case.

The parties and the trial court agreed that appellant should be sentenced as a Range I offender.  The State advanced three enhancing factors: (1) that appellant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range; (2) that appellant, before trial or sentencing, had failed to comply with the conditions of a sentence involving release into the community; and (3) that at the time appellant committed the felony, he was on probation.  Tenn. Code Ann. § 40-35-114 (1), (8), (13).  In support of the enhancement factors, the State noted appellant's 2009 conviction for attempted criminal simulation; his 2009 conviction for criminal trespass; his 2010 conviction for possession of drugs; his 2010 conviction for vandalism; and his 2010 conviction for evading arrest, all of which were unrelated.  Appellant advanced as mitigating factors that appellant was homeless and self-medicating when he was convicted of simple possession of

marijuana; that he attempted to commit criminal simulation to make money to live and to eat; that he had no previous violence in his criminal history; and that he suffered from bipolar disorder. *See* Tenn. Code Ann. § 40-35-113(13).

The trial court considered the principles and purposes of the sentencing act, the evidence presented at trial and the sentencing hearing, appellant's statements, the presentence report, arguments as to sentencing alternatives, enhancing and mitigating factors, the nature and characteristic of the criminal conduct, and the statistical information provided by the Administrative Office of the Courts in passing sentence. *See* Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). The trial court applied factor (1) of Tennessee Code Annotated section 40-35-114, based on appellant's five prior misdemeanor convictions; factor (8), based on appellant's violation of a July 9, 2010 probation order by committing the new offense of evading arrest; and factor (13), based on appellant's being on probation for attempted criminal simulation at the time he committed the instant offense. As mitigation, the trial court considered appellant's mental conditions but did not lend that factor great weight, concluding that it "[didn't] see any mitigating factors, but there are three enhancing factors." *See* Tenn. Code Ann. § 40-35-113(13). The trial court then imposed a sentence of ten years, to be served at eighty-five percent release eligibility. Appellant now appeals his conviction and sentence to this court.

II. Analysis

Appellant raises two issues in this appeal: sufficiency of the convicting evidence and the length of his sentence.

A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the

evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for aggravated robbery as indicted in this case, the State must have proven beyond a reasonable doubt that appellant intentionally or knowingly committed "theft of property from the person of another by violence or putting the person in fear" and

that he accomplished the robbery "with a deadly weapon or by display of any article used or fashioned to lead the victim to believe it to be a deadly weapon." Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1). Appellant's primary argument rests on the "significant unreliability" of the eyewitness's testimony and identification of him, together with the lack of physical evidence at the crime scene.

The evidence establishes that appellant, dressed in black and attempting to conceal his identity, forced his way through the security door leading into the cashier's area of Lee's Market by kicking it in, wielded a gun toward the victim, and demanded that she open the cash register. However, Ms. Haule had seen appellant more than three times in the past and recognized the uncovered portion of his face even as he entered the store. The victim testified that she was frightened. Appellant stole over $80 in cash and three packs of Newport cigarettes. Although no physical evidence from the crime scene associated appellant with the offense, police officers located on appellant's person the cash, the cigarettes, the weapon, the red bandanna with which he tried to obscure his face, and the black "hoodie" he was wearing. The victim again positively identified appellant. The State presented sufficient evidence by which to convict appellant of aggravated robbery. The jury obviously accredited the testimony of Ms. Haule and the police officers and discredited appellant's alternative explanation. We will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence.

-16-

*Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835.  This issue is without merit.

B.  Sentencing

Appellant challenges the trial court's imposition of a ten-year sentence rather than the minimum sentence of eight years.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation.  Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b).  In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory

presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial

court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court properly considered all requisite factors in passing sentence. It properly applied factor (1) of Tennessee Code Annotated section 40-35-114, based on appellant's five prior misdemeanor convictions; factor (8), based on appellant's violation of a July 9, 2010 probation order by committing the new offense of evading arrest; and factor (13), based on appellant's being on probation for attempted criminal simulation at the time he committed the instant offense. Appellant's specific complaint lies with the trial court's failure to find that he was motivated to provide necessities for himself or his family and that he was suffering from a mental condition that significantly reduced his culpability. Tenn. Code Ann.§ 40-35-113(7), (8). Appellant testified with regard to his prior conviction for

-19-

attempted criminal simulation that he committed that offense because he was homeless and was trying to get money for food. However, he denied any participation in or responsibility for the instant offense. His testimony at trial contradicts a finding that he was motivated to provide necessities for himself or his family in committing this offense. The trial court properly declined to find this mitigating factor.

Moreover, the trial court considered but did not find appellant's alleged mental condition as a mitigating factor. Even if in error, as noted above, a trial court's misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. The record reflects that the trial court scrupulously followed the statutorily-defined procedures and imposed a proper within-range sentence. Appellant is not entitled to relief from his ten-year sentence.

## CONCLUSION

Based on the record as a whole, the parties' briefs, and controlling legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE